



**FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

**05   6231**

|  |  |
|---|---|
| PLAINTIFFS UNDER SEAL | ) ) ) |
| v. | ) ) |
| DEFENDANTS UNDER SEAL | ) ) ) |

Civil Action No. _____

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## 31 U.S.C. § 3729, ET SEQ.



DEC − 2 2005

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

Sharon M. Gurak, Esq. (Pa. Bar No. 40026)
Mitchell R. Kreindler, Esq. (Pa. Bar No. 80161)
KREINDLER & ASSOCIATES, P.C.
7 Great Valley Parkway, Suite 210
Malvern, Pennsylvania 19355-1425
Telephone: (610) 889-1100
Facsimile: (610) 889-1112

W. Scott Simmer
Thomas J. Poulin
Meredith A. Taylor
ROBINS, KAPLAN,
MILLER & CIRESI L.L.P.
1801 K Street, N.W.
Suite 1200
Washington, D.C. 20006
Telephone: (202) 775-0725
Facsimile: (202) 223-8604

*Counsel for Plaintiffs/Relators*

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA <br> ex rel. MARY JEAN BROWN, <br> KARL S. SCHUMANN, and KEVIN WAITE, <br><br> Plaintiffs, <br><br> v. <br><br> ASTRAZENECA PHARMACEUTICALS, L.P.; <br> BAYER CORPORATION; <br> BRISTOL-MYERS SQUIBB COMPANY; <br> G.D. SEARLE & CO., n/k/a Pfizer, Inc.; <br> GLAXOSMITHKLINE; <br> HOECHST-MARION ROUSSEL, INC., n/k/a <br> Sanofi-Aventis, S.A.; <br> PFIZER, INC., <br> SANDOZ, LTD., n/k/a Novartis, Ltd.; <br> SCHERING-PLOUGH CORPORATION; <br> SERONO INTERNATIONAL, S.A.; and <br> THERASENSE, INC., n/k/a <br> Abbott Laboratories, Inc. <br><br> Defendants. | Civil Action No. _____ <br><br><br> **FILED UNDER SEAL** <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729, ET SEQ.

Filed Under Seal

This is an action brought on behalf of the United States of America by Mary Jean Brown, Karl S. Schumann, and Kevin Waite, by and through their attorneys, Robins, Kaplan, Miller & Ciresi, LLP, and Kreindler & Associates, P.C., against Defendants pursuant to the qui tam provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

2.     This Court has personal jurisdiction over the Defendants because, among other things, the Defendants transact business in this District, and Defendants engaged in wrongdoing in this District.

3.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants transact business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

4.     The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## PARTIES

5.     Mary Jean Brown, Pharm. D., is a resident of Arizona, and is a former employee of AdvancePCS, Inc. n/k/a CaremarkPCS, Inc. ("AdvancePCS"), a pharmacy benefit manager that contracted with the Defendants.

6.     Karl S. Schumann, is a resident of New Jersey, and is a former employee of Advance Paradigm, Inc. (hereafter "API"), n/k/a CaremarkPCS, Inc., a pharmacy benefit manager that contracted with the Defendants.

Filed Under Seal

7.     Kevin Waite is resident of Arizona, and is a former employee of AdvancePCS, Inc., n/k/a CaremarkPCS, Inc., a pharmacy benefit manager that contracted with the Defendants.

8.     Defendant AstraZeneca Pharmaceuticals, L.P. ("AZ") is a corporation organized, existing and doing business under and by virtue of the laws of Delaware, with its office and principal place of business located at 1800 Concord Pike, Wilmington, Delaware, 19850.   AZ was formed by the announced 1998 merger of Britain's Zeneca Group PLC and Sweden's Astra AB in 1999.   AZ is engaged in the development, manufacture, distribution, and sale of pharmaceutical and health care products in the United States.   Throughout the relevant period, AZ manufactured and sold substantial quantities of its drug products in Pennsylvania and in the United States.

9.     Defendant Bayer Corporation ("Bayer") during all times material hereto was an Indiana Corporation with a principal place of business in Pittsburgh, Pennsylvania.   Bayer's shares were and are not publicly traded in the United States; Bayer's shares were owned by Bayer A.G., a German corporation with a principal place of business in Leverksen, Germany.   At all relevant times, Bayer has been engaged in, among other things, the manufacture, promotion, sale and interstate distribution of pharmaceutical products.   Throughout the relevant period, Bayer manufactured and sold substantial quantities of its drug products in Pennsylvania and in the United States.

10.     Defendant Bristol-Myers Squibb Company ("BMS") is a Delaware corporation with its principal corporate offices located at 345 Park Avenue, New York, New York.   BMS is a leading U.S. pharmaceutical company and the manufacturer of several top-selling brand-name prescription drugs.   Throughout the relevant period, BMS manufactured and sold substantial quantities of its drug products in Pennsylvania and in the United States.

Filed Under Seal

11.     Defendant G.D. Searle & Co. ("Searle") is a Delaware corporation with its principal place of business in Skokie, Illinois. Throughout the relevant period, Searle engaged in the business of manufacturing, marketing, distributing and selling branded drugs throughout the United States and the State of Pennsylvania. In April, 2000, Searle was acquired by Pharmacia Corporation, as a result of the April 2000 merger of Pharmacia & Upjohn with Monsanto Company and its G.D. Searle unit. Pharmacia was subsequently acquired by Pfizer, Inc. in 2003. Throughout the relevant period, Searle manufactured and sold substantial quantities of its drug products in Pennsylvania and in the United States.

12.     Defendant GlaxoSmithKline PLC ("GSK") is a United Kingdom corporation, with its principal offices located at Glaxo Wellcom House, Berkely Avenue, Grenford, Middlesex, UB6 ONN, United Kingdom. GSK was formed from the merger of Glaxo Wellcome and SmithKline Beecham, a Pennsylvania corporation, with principal offices located at One Franklin Plaza, Philadelphia, Pennsylvania 19102. SmithKline Beecham is a subsidiary of GSK. GSK is one of the world's leading pharmaceutical companies, with operations based in Philadelphia, Pennsylvania.  Throughout the relevant period, GSK manufactured and sold substantial quantities of its drug products in Pennsylvania and in the United States.

13.     Defendant Hoechst Marion Roussel, Inc. ("HMRI") is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri. HMRI is, directly or indirectly, a wholly-owned subsidiary of Sanofi-Aventis, S.A. ("Sanofi"), which is incorporated under the laws of the Republic of France with its office and principal place of business at 25 Quai Paul Doumier, 92408 Courbevoie Cedex, France. On information and belief, Sanofi-Synthelabo, Inc. is the U.S. affiliate of Sanofi, resides in this

5                                    Filed Under Seal

judicial district, and is registered to do business in Pennsylvania. On information and belief, Sanofi-Synthelabo, Inc. is the agent of Sanofi for purposes of the company's business in this judicial district, has sold its drug products throughout the United States and in Pennsylvania.

14.     Defendant Pfizer, Inc. ("Pfizer") is a Delaware Corporation with its principal place of business at 235 East 42nd Street, New York, New York.  Throughout the relevant period, Pfizer marketed and sold substantial quantities of its drug products throughout the United States and in Pennsylvania.

15.     Defendant Sandoz Ltd., now part of Novartis, Ltd., is a corporation organized, existing and doing business under and by virtue of the laws of Switzerland, with its office and principal place of business located at Lichtstrasse 35, CH-4002 Basel, Switzerland.  Sandoz operates in the United States through its wholly-owned subsidiary, Sandoz Corporation, (collectively herein "Sandoz"). Sandoz Corporation is a corporation organized, existing, and doing business under and by virtue of the laws of New York with its office and principal place of business located at 608 Fifth Avenue, New York, New York 10020.  In 1996, Ciba-Geigy Corporation and Sandoz merged to form Novartis AG, a corporation organized, existing, and doing business under the laws of Switzerland with its office and principal place of business located at Centralbahnstrasse 7, CH-4010 Basel, Switzerland.  At all times material hereto, Sandoz manufactured and sold substantial quantities of its products throughout the United States including in Pennsylvania.

16.     Defendant Schering-Plough Corporation ("Schering") is a New Jersey corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey. Schering is engaged in the discovery, development, and marketing of brand-name and generic drugs, as well as over-the-counter healthcare and animal care products. Throughout the relevant

Filed Under Seal

period, Schering manufactured and sold substantial quantities of its drug products in the United States and in Pennsylvania.

17.    Defendant Serono International, S.A. ("Serono") is a Swiss global biotechnology company located at 15bis, chemin des Mines,    Case Postale 54, CH-1211 Geneva 20, Switzerland.  Serono's U.S. subsidiary, Serono Laboratories, Inc., is organized under the laws of Massachusetts and is located at One Technology Place, Rockland, Massachusetts 02370.  At all times material hereto, Serono manufactured and sold substantial quantities of its products throughout the United States including in Pennsylvania.

18.    Defendant Therasense, Inc. is a corporation that was purchased by Abbott Laboratories in April 2004.  Abbott Laboratories acquired Therasense and combined it with its MediSense business to form Abbott Diabetes Care.  Therasense, Inc.'s office and principal place of business is located at 1360 S. Loop Road, Alameda, California, 94502.  Therasense is engaged in the development, manufacture, distribution, and sale of health care products in the United States.  Therasense is a leading manufacturer of glucose self-monitoring devices for diabetics.  Throughout the relevant period, Therasense manufactured and sold substantial quantities of its products in the United States and in Pennsylvania.

## SUMMARY OF ILLEGAL CONDUCT

19.    Defendants contracted with AdvancePCS ("AdvancePCS") (or its predecessor companies prior to their merger – PCS Health Systems, Inc. ("PCS") and Advance Paradigm, Inc. ("API")) (collectively, "the PBM's") to improperly influence the PBM's selection of drug products for preferred status on formularies or mail order utilization by presenting, or causing to be presented, false claims under the False Claims Act, by providing prohibited remuneration under the Federal Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b(b), and failing to report

7                                   Filed Under Seal

new Best Prices under 42 U.S.C. § 1396r-8 (the Medicaid "Best Price" program). The conduct of Defendants described in this complaint was done willfully and knowingly.

20.     The PBM's in turn contracted with various prime contractor health plans who offered benefits to employees of the Federal Government, and for various governmental programs, including health benefit carriers offering benefits under the Federal Employees Health Benefits ("FEHB") program under a prime contract with the Blue Cross Blue Association ("BCBSA"), the Health Insurance Program for the Elderly and Disabled, more commonly referred to as the Medicare Program, 42 U.S.C. § 1395, *et seq.* via Medicare Part C, also known as Medicare+Choice, patients covered by the Indian Health Service, Medicaid, the Mail Handler's Health Benefit Plan ("MHHBP"), the U.S. Secret Service Employees Health Association (SSEH) Health Benefit Plan, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as TRICARE) and the Veteran's Health Administration ("VHA") (collectively, the "federally funded health insurance programs" or "Federal Programs").

21.     At all times material hereto, Defendant Manufacturers also sold and provided drugs directly to the PBM's mail order pharmacies for use in their mail facilities for dispensing to Federal Program beneficiaries.

22.     The payment of monies to the PBM's by Defendants to steer product selection on Federal Program formularies as well as purchasing at mail order pharmacies was done to maintain or increase the utilization of Defendants' drug products, and constitute kickbacks pursuant to the AKA. These kickbacks constitute false claims for payments. Moreover, upon information and belief, the provision of free drugs to the PBM's mail order pharmacies as described herein established a new Best Price that was not reported by Defendants.

Filed Under Seal

23. The Defendants' submission of false claims (or the causing of submission of false claims) and the payment of kickbacks to the PBM's makes them liable under the False Claims Act, which imposes liability on persons who fraudulently obtain federal funds through a government contractor or grantee, either by presenting, or causing to be presented, a false or fraudulent claim for payment or approval. The Defendants' income derived from or implicated by kickbacks are fraudulent claims paid by or on behalf of Federal Programs because of the kickbacks, and Defendants were not entitled to receive those payments because of the kickback violations.

24. The kickbacks given by these Defendants were provided at the expense of Federal Programs, as set forth in more detail below, to avoid Best Price reporting obligations for these products.

25. On August 7, 2005, AdvancePCS, n/k/a CaremarkPCS, entered into a Settlement Agreement with the United States Attorney's Office for the Eastern District of Pennsylvania, the Department of Justice, the Office of Personnel Management, the Department of Health & Human Services, and the Relators for $137,500,000, in which it settled claims for, *inter alia,* (a) administrative fees from pharmaceutical manufacturers for services related to the negotiation and administration of rebate contracts with drug manufacturers, and (b) fees for products and services agreements from drug manufacturers for the provision by AdvancePCS to those manufacturers of pharmacy or medical data, outcomes research studies, RxReview and Clinical Consulting services, and Resolve 550 programming and data.

26. The Defendant Manufacturers knowingly and willfully submitted false claims and/or caused false claims to be submitted in violation of the FCA, and offered and paid and/or caused to be offered and paid, prohibited remuneration to the PBM's, directly and indirectly,

Filed Under Seal

overtly and covertly, in cash and in kind, to induce the PBM's to refer the Defendants' drug products to health plans for which payments were made in whole and in part under Federal Government programs, all in violation of the AKA.

## FACTUAL ALLEGATIONS

### A.    PBM's Are the Gatekeepers for Drug Manufacturer Access and Sales.

27.    Pharmacy benefit managers, by virtue of their industry clout, are able to influence drug product selection and prices of prescriptions that impact Federal Programs, and as such, are vitally important to Defendants' ability to sell their drug products and earn substantial profits.

28.    One means by which PBM's exert this influence over drug selection is by the use of a drug "formulary." A formulary is a list of drugs by therapeutic category which the PBM's plan sponsors, including Federal Programs, will pay for under their federally funded drug benefit program.    Accordingly, a drug that is not on the PBM's formulary will be severely disadvantaged. Even within the PBM's formulary, drugs in the same therapeutic category can obtain preferred status over other drugs within the category -- e.g., cholesterol-lowering drugs Pravachol over Zocor. AdvancePCS referred to its subset of the AdvancePCS formulary, which included preferred drugs within therapeutic categories, as the Preferred Drug List ("PDL").

29.    The PBM's plan sponsors, such as Federal Programs, usually adopt their PBM's drug formulary, thereby making the PBM's formulary decisions critically important since those drugs that have preferred formulary status will be dispensed and paid for at the retail level, ensuring sales of Defendants' drugs.

30.    Thus, the inclusion of a manufacturer's drug product on a PBM's formulary ensures coverage by plan sponsors, and therefore utilization and sales. Formulary inclusion is

critical to achieving revenues of billions of dollars that fuel high profit margins. Conversely, the exclusion of a drug product from a PBM's formulary usually means low (or no) utilization, and thus less sales. Therefore, formulary access is perceived as vital and essential to Defendants.

31.     During the decade of the '90's and continuing through the early 2000's, the highly lucrative market for prescription drugs incented drug manufacturers to position their drug products to maximize profit. This same time period saw the emergence of PBM's as a market participant with tremendous influence over prescription drug management and sales by virtue of their contracts with plan sponsors, including Federal Programs.

32.     This confluence of events - manufacturer profit-maximization goals and PBM clout - created a situation in which manufacturers, including Defendants, needed, and thus sought to influence, the PBM's ability to favorably position the Defendants' drugs.

33.     Defendants sought out to influence the PBM's formulary and marketing, and did so by paying illegal kickbacks - paying lucrative fees to ensure that the PBM's included their drugs on formularies, including preferred status within those formularies.

34.     These fees, which amounted to hundreds of millions of dollars, were paid to the PBM's under the guise of being legitimate service agreement fees, therapeutic class partnership fees, products and services fees, program fees, administrative fees, and educational grants.

35.     In reality, the PBM's services or programs had no or little value other than as payment to influence the PBM's. Rather, drug manufacturers agreed to "pay to play" and referred to entering into an agreement as "getting into the game" in that it was the only way the Defendants could place its drugs on the PBM's preferred formularies and increased use in mail order pharmacies.

Filed Under Seal

36.     Certain Defendants, such as Pfizer, also provided kickbacks in the form of direct shipments of below Best Price cost for drug products for use in the PBM's mail order pharmacies in exchange for favorable treatment and to fund marketing activities.

**B.     Defendants Pay "Money for Nothing" to API to Secure Sales and Increase Profits.**

37.     At API, predecessor to AdvancePCS, company employees aptly characterized drug manufacturer payments for the services or programs by reference to a popular song at the time, as "money for nothing."

38.     Beginning in or around 1994, API began entering into Services Agreements with certain key drug manufacturers in which the manufacturers agreed to pay several million dollars per year in exchange for API providing "services."

39.     As part of the Services Agreements, API's formulary was set up around key manufacturers' products that had been taken off of the Medco formulary, or disadvantaged on that formulary, subsequent to the Merck acquisition of Medco.

40.     In exchange for the kickbacks received, API agreed to modify the manufacturers' drug(s) representation on the API formulary, by removing competitor drug products and by adding additional drugs of those manufacturers that agreed to these side Services Agreements.

41.     For example, to counter the fact that BMS drugs had been removed from Medco's formulary in favor of Merck products with the Merck acquisition of Medco, API in turn, after successful agreement to a three year Services Agreement, removed Merck products from the API formulary and added those BMS products that directly competed against Merck in the marketplace. In addition, all other branded BMS products were added to the API formulary.

Filed Under Seal

42.     There was a nominal services component to the agreements, usually involving the sale of relatively useless - and often duplicative - data. In many cases, similar data was already being provided pursuant to the rebate contracts between API and drug manufacturers.  For example, the Service Agreement entered into with BMS in 1994 was for minimal services, mostly involving a "data dump" which was of no use to BMS.  In fact, a key BMS employee referred to the boxes of data provided as making a good "door stop" because it had little other use to BMS than, literally, a door stop.

43.     Services Agreements were very lucrative for API, as this revenue went straight to its bottom line and was never shared with customers, including Government Programs. For example, Schering's Services Agreement, with regard only to Claritin, paid API approximately $4.5 million dollars per year throughout its duration (on top of the rebates API received for Claritin) ostensibly under a "research" agreement with Defendant's subsidiary, Innovative Medical Research ("IMR") located in Hunt Valley, Maryland.

44.     The main purpose, if not the only purpose, of the Services Agreements was to condition payment on continued formulary access. The kickbacks were not be to be shared with, and were in fact concealed from, API's customers.

45.     It was made clear in negotiations with the drug manufacturers that API would craft a separate Services Agreement, apart from the rebate agreement. The Services Agreements were negotiated with the drug manufacturers at the same time as the rebate agreements, with the same negotiators for each side. During the negotiations API made clear that the Services Agreements were an inducement for including the drug manufacturers' products' on API's formulary, or to disadvantage competitors' products.

13                          Filed Under Seal

46.     Among the manufacturers which entered into Services Agreements with API were: Bayer Corporation, BMS, G.D. Searle (n/k/a Pfizer), Glaxo Wellcome (n/k/a GlaxoSmithKline, PLC), Hoescht-Marion Roussel, Inc. (n/k/a Sanofi), Sandoz (n/k/a Novartis), and Schering-Plough, Inc.

C.     **Defendants Enter Into Therapeutic Class Partnership Agreements With PCS Health Systems.**

47.     At PCS Health Systems, Inc., beginning in 1997 the company entered into a series of 15 Therapeutic Class Partnerships ("TCP") with certain of the Defendant Manufacturers to provide RX Review letters and Clinical Consulting programs, described below.

48.     During the negotiations to set up the TCP arrangements, the Defendants frequently openly discussed concerns about TCPs violating the Anti-Kickback statute ("AKA").

49.     While the Defendant Manufacturers paid PCS for every letter sent to physicians under RX Reviews, and paid for other like "services," they were careful not to include any provisions in the TCP agreements which included share guarantees or return guarantees that would make it appear as though PCS was shifting patients to drugs in exchange for financial gain.

50.     In actuality, PDL placement and, therefore, the promotion of PDL drugs by PCS, was sold to drug manufacturer paying the most money in the way of rebates, service fees, unrestricted educational grants, administrative fees, and other monies, most of which PCS did not disclose nor pass through to its customers, including Government Programs.

51.     PCS sold PDL placement to the highest bidders for including their drugs on its PDL and, in many cases, granting such drugs exclusivity, without regard to the resulting costs to

Filed Under Seal

Government Programs, clinical efficacy of one drug over another, or resulting health risks to Government Programs' members.

52. In many cases, the drugs included on the PDL were more expensive than others in the therapeutic category.

53. The PCS TCP program had contracts with certain of the Defendant Manufacturers that required them to pay PCS several million dollars in exchange for very little. For example, certain of the Defendant Manufacturers agreed to spend millions of dollars on TCP's in exchange for research projects, RX Review letter launches and other tangible, yet non-specific promises.

54. Many of the Defendant Manufacturers agreed to purchase the PBM's products and services without knowing what they were going to get back from PCS.

55. The key for PCS was that any agreement would result in the establishment of a bank account funded by the Defendant Manufacturers from which PCS could draw from.

56. The TCP research programs were nothing more than a cover PCS used, while in reality PCS was selling the Defendant Manufacturers the promise to move market share for certain drugs on the PDL.

57. PCS sales representatives communicated to the Defendant Manufacturers that PCS would move market share of the manufacturer's products. However, there were no PCS contracts that referenced directly or indirectly market share movement.

58. In an attempt to retain a larger percentage of the rebate fees, PCS came up with the idea to create a services division. The services grew steadily, and were very much in play by the time API purchased PCS Health Systems.

59. Among the drug manufacturers which purchased TCP programs from PCS were Parke Davis, Glaxo, Pharmacia-Upjohn, BMS, and Eli Lilly.

Filed Under Seal

**D.** **AdvancePCS Enters Into Products and Services Agreements With the Defendant Drug Manufacturers to Secure PDL Placement and/or To Avoid Best Price.**

60.     After the API acquisition of PCS to form AdvancePCS, RX Review mailings and Clinical Consulting were increasingly market share driven, and AdvancePCS strategy was to use RX Reviews and Clinical Consulting as a tool for the Defendant Manufacturers to increase market share via off-label prescribing.

61.     Although AdvancePCS may have given the appearance that choosing drugs for its formulary and PDL was "on behalf of their clients," behind the scenes it employed an aggressive philosophy of negotiating with the Defendant Manufacturers using "PDL leverage" and "swagger" in order to obtain deals which directly tie payment of kickbacks to PDL placement.

62.     AdvancePCS used leverage to offer the Defendant Manufacturers increased market shares in exchange for payment of monies, promising that the Defendant Manufacturers could expect a significant "return on investment" through increases in incremental sales of PDL drugs.

63.     Secrecy was paramount.  All the negotiations between AdvancePCS and the Defendant Manufacturers about these side deals were presented either orally or on an erasable white board, and were never included in any hard copies.

64.     The Defendant Manufacturers knew that the programs (including RX Review and Clinical Consulting) had no real value other than as leverage for the PDL.  AdvancePCS's negotiators insisted that drug manufacturers "pay to play" and referred to drug manufacturers who entered into an agreement as "getting into the game" in that it was the only way the manufacturer could place its drugs on the PDL.

Filed Under Seal

65.     The AdvancePCS negotiators regularly used Government Programs as part of its leverage to obtain greater "intervention" fees – *i.e.,* fees for services to increase market share of PDL drugs. For example, AdvancePCS' negotiators regularly told the Defendant Manufacturers that, if they did not cooperate, there would be 10 million FEP claims out of their reach.

66.     Under the Best Price statute, a pharmaceutical manufacturer is required to provide the Medicaid program an AMP minus 15.1% discount. But, because AdvancePCS controlled a larger population than Medicaid, Defendants were willing to give AdvancePCS greater discounts than their Best Price to the government.

67.     In many instances, the Defendant Manufacturers, in turn, realized that AdvancePCS book of business was worth the greater discount, but were unwilling to offer a flat-out better than Best Price discount to AdvancePCS because under the Best Price statute they would also have to provide the same rebate to the Medicaid program.

68.     So, AdvancePCS came up with the Intervention Products and Services program, sold through the Strategic Alliances department. The program allowed many of the Defendant Manufacturers to pay for so-called "Intervention Products and Services" as the vehicle that ultimately results in a better than Best Price discounts to AdvancePCS, without actually changing the rebate.

69.     Following the purchase of Intervention Products and Services programs by drug manufacturers, most manufacturers would actually reduce the discounts on their rebates to offset the fact they were putting monies into the Intervention Products and Services to make up the difference.

70.     Defendants were eager to enter these agreements particularly when they were vulnerable to competition – *e.g.,* when a drug's patent was expiring and the manufacturer was

17                                          Filed Under Seal

hoping to bridge business to a new product (*e.g.*, Schering's Claritin to Clarinex) or when a manufacturer was introducing a new product to the market, such as AZ's Crestor.

      E.      **Defendant Manufacturers Funded Clinical Consulting and RX Review Programs as Inducements for the Selection of Their Drug Products.**

71.      Defendants paid significant kickbacks via these programs such as AdvancePCS "Clinical Consulting" and "RX Review" – additional means to funnel money to AdvancePCS to secure favorable formulary placement.

72.      One of these sham "services" that Defendants paid AdvancePCS to influence product selection was through the guise of "Clinical Consulting," a program whereby the AdvancePCS marketed preferred drugs to physicians on behalf of pharmaceutical manufacturers (known as "detailing" to physicians).

73.      Indeed, on information and belief, the Clinical Consulting division was nothing more than a sales agent of the drug manufacturers being used to convince physicians to change their prescribing habits in exchange for hefty fees.

74.      Although Clinical Consultants purportedly presented "unbiased" information regarding the cost-effectiveness and efficacy of PDL drugs, the information Clinical Consultants presented was in fact biased because the program, and, indeed, their salaries, have been completely funded by the Defendants.

75.      Defendants also paid significant kickbacks via agreements for a program called "RX Review" – an additional means to secure favorable formulary placement.

76.      RX Reviews are newsletters that have been sent to physicians by the PBM promoting the clinical virtues of specific PDL drugs.

Filed Under Seal